UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SALLY B. LAURENT                          CIVIL ACTION

VERSUS                                    NUMBER: 07-3831

MICHAEL J. ASTRUE,                        SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), presently before the Court are the parties' briefs following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 20, 25, 29).

Sally B. Laurent, plaintiff herein, filed the subject applications for DIB and SSI benefits on October 21, 2004, alleging disability as of July 31, 2002. (Tr. pp. 44-48, 251-253). In a Disability Report completed by plaintiff on October 15, 2004, she identified spondylolisthesis of the back, degenerative disc

disease, and arthritis of the knees with resulting pain as the conditions resulting in her inability to work. (Tr. pp. 58-67). Plaintiff's applications for Social Security benefits were denied at the initial step of the Commissioner's administrative review process on January 3, 2005. (Tr. pp. 31-34, 254-255). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on May 23, 2006 at which plaintiff and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 35, 359-391). On June 13, 2006, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 13-23). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In the brief supporting her action for judicial review, plaintiff essentially argues that: 1) she was not properly informed of her right to and given the opportunity to obtain counsel prior to the administrative hearing, 2) the ALJ's residual functional capacity ("RFC") assessment was not supported by substantial evidence, and 3) the testimony of the VE regarding her past relevant work was flawed. (Rec. docs. 20, 29). Relevant to the

issues to be decided by the Court are the following findings made

by the ALJ:

1. [t]he claimant met the insured status requirements of the Social Security Act through December 31, 2005.

2. [t]he claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).

3. [t]he claimant has the following severe impairments: lumbar spondylolisthesis and degenerative disc disease, and arthritis of the left shoulder and knees (20 CFR 404.1520(c) and 416.920(c)).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a limited range of sedentary work. Specifically, after thirty minutes of sitting, she needs the option to stand and walk a pace or two, and she cannot lift more than ten pounds with both hands and no more than five pounds with the left hand.

6. [t]he claimant is capable of performing past relevant work as customer service representative and bench assembler. This work does not require the performance of work-related activities precluded by the claimant's residual capacity (20 CFR 404.1565 and 416.965).

7. [t]he claimant has not been under a "disability," as defined in the Social Security Act, from July 31, 2002 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. pp. 18, 19, 22).

Judicial review of the Commissioner's decision to deny DIB or

SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de</u> <u>novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social

Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.

> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

> 5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

The administrative hearing that was conducted in plaintiff's case was held in Hattiesburg, Mississippi, where she had relocated to following Hurricane Katrina. At that time, plaintiff was fifty-two years of age, had completed high school and obtained an associate degree in general studies, and had past relevant work

experience as an insurance agent, a customer service representative, a passport agent, and a computer assembler. At the outset of the hearing, plaintiff was duly advised of her right to retain an attorney or representative and she was given the option of continuing the matter for that purpose if she so chose. Plaintiff elected to proceed without representation and signed a written waiver to that effect. (Tr. p. 42). The ALJ and plaintiff then discussed the documentary evidence to be admitted as exhibits with plaintiff arguing that the x-rays taken by Dr. Carroll should be given diminished weight as compared with the opinions of her orthopedist, Dr. McLachlan. Plaintiff also explained that she had not received any further medical treatment since relocating to Hattiesburg except for one emergency room visit and two brief doctor visits.

After the exhibits were admitted into evidence, plaintiff was placed under oath and was questioned by the ALJ. Plaintiff was then living in a FEMA trailer with her grandson and her husband, the latter of whom was already receiving disability benefits. Reflecting back on her past jobs, plaintiff testified that insurance sales from her home caused her right hand to go numb due to phone usage and that sales in the field were difficult due to the materials she had to bring with her. The computer assembler job plaintiff once had involved more sitting than standing. As for

health concerns, plaintiff testified to problems with her back, knees, and joints with pain throughout her whole body, spondylolisthesis in the lower back, and neck spasms. Plaintiff had not seen a doctor recently secondary to financial difficulties but a nurse practitioner had diagnosed her with arthritis and prescribed medication for that condition. Naprosyn was not effective but instead caused drowsiness and while Darvocet and Zanaflex eased plaintiff's pain, it never resolved in its entirety. Prescription medication also upset plaintiff's stomach.

Plaintiff further testified that she was sometimes unable to move her left arm and was unable to lift objects heavier than five pounds due to pain. She estimated that she could only walk a short distance before experiencing lower back pain and if she sat for any period of time she would have leg pain and burning in the thigh. Plaintiff's ankles hurt when she shopped so she used a shopping basket for support. Plaintiff indicated that she was in pain all of the time and that it hurt to sit, stand, or walk. When asked to estimate the amount of time she could sit, plaintiff testified that she could possibly do so for one hour if given a comfortable chair but her hands had already begun to tingle and her back had become painful during the course of the hearing. When asked if she could return to her past job as a computer assembler, plaintiff answered in the negative, citing excessive sitting demands, poor eyesight,

problems with concentration/attention, poor memory, and the need to alternate sitting and standing. (Tr. pp. 361-386).

Donald Woodall, a VE, was next to take the stand. He began by testifying to the exertional and skill demands of plaintiff's previous jobs, as follows: insurance sales agent-light, skilled; customer service representative-sedentary, semi-skilled; passport agent-light, skilled; and assembler-light, unskilled but actually performed by plaintiff at the sedentary level. The ALJ then posed a hypothetical question to Woodall which assumed an individual of plaintiff's age, education, and past work experience who was limited to sedentary work with alternating sitting and standing and who could lift five pounds with the left hand and ten pounds with both hands. With the foregoing limitations in mind, the VE testified that the individual could perform plaintiff's past work as a customer service representative or assembler. However, if the individual suffered from pain such that she could not maintain attention and concentration for significant periods of time, none of plaintiff's past work could be performed.

Plaintiff was then given the opportunity to comment on Woodall's testimony or to ask him any questions she felt were appropriate. Contrary to the VE's testimony, plaintiff stated that she was unable to function as an assembler because of numbness in the hands and an inability to lift ten pounds without experiencing

significant pain.   In addition, her previous job as customer service representative could no longer be performed because of an inability to hold the telephone and the occurrence of migraine headaches if a headset was used. (Tr. pp. 386-391).

The documentary evidence admitted in the administrative proceedings below indicates that plaintiff sustained an injury to her right knee on April 19, 2001 while working as an insurance agent. (Tr. p. 175).   She was subsequently seen by Dr. John McLachlan, an orthopedist, on June 11, 2001 with complaints of right knee pain when walking, catching, and pain extending down the outside of the right leg.   Plaintiff also related a past history of spondylolisthesis with right calf pain and lateral thigh pain.   On physical examination, the right knee demonstrated a positive McMurray sign suggesting a meniscal tear and an MRI of that extremity was ordered. (Tr. pp, 175, 202).   Later that night, plaintiff presented herself at the Pendleton Methodist Hospital ("PMMH") emergency room complaining of a throbbing headache.   The diagnosis was a migraine headache that resolved itself after plaintiff was given injections of Compazine and Toradol.   Fioricet was also prescribed. (Tr. pp. 95-97).   An MRI of plaintiff's right knee was attempted on June 19, 2001 but was not completed.   The results that were obtained showed a small knee joint effusion, chondromalacia changes of the posterior patella articular surface,

and increased signal within the lateral meniscus showing a possible horizontal tear but no abnormality of the medial meniscus was confirmed. (Tr. pp. 173-174). Plaintiff returned to Dr. McLachlan on June 27, 2001 with complaints of right knee pain and episodes of locking. Findings of the doctor's examination were suggestive of chondromalacia of the patella. Plaintiff was placed on Celebrex and the MRI study was to be completed. (Tr. pp. 170, 202). That test was performed by Dr. Lamar Teaford on July 12, 2001. (Tr. p. 172). After comparing the two test results, Dr. Teaford issued an addendum in which he clarified that there was no concern for the lateral meniscus but that there was evidence of a horizontal tear of the medial meniscus. (Tr. pp. 167-168). Plaintiff was seen again by Dr. McLachlan on July 18, 2001 and additional testing was ordered. (Tr. p. 169).

As requested by Dr. McLachlan, plaintiff underwent EMG and nerve conduction studies on July 31, 2001. The results of those tests were minimal abnormalities limited to the right iliopsoas suggesting the possibility of a right L3 and/or L4 radiculopathy. (Tr. p. 165). Plaintiff returned to Dr. McLachlan on August 6, 2001 and complained of medial right knee pain and locking. McMurray sign was positive. (Tr. pp. 166, 203). The next medical records document plaintiff's visit to the PMMH emergency room on October 13, 2001 with complaints of a one-week history of generalized,

severe head pain and occasional dizziness with standing. Plaintiff was treated with Inapsine and Toradol and her pain improved markedly but still persisted. Meningitis was considered to be a possibility but plaintiff declined a spinal tap to rule that out. The diagnosis was acute febrile illness of uncertain etiology and headache of uncertain etiology. Plaintiff was discharged home in good condition with Fioricet. (Tr. pp. 98-102). It appears that an MRI of the lumbar spine was ordered by Dr. McLachlan and was attempted to be scheduled throughout 2001 but that testing did not go forward secondary to insurance coverage issues. (Tr. pp. 118-122).

Plaintiff was next seen by Dr. McLachlan on June 28, 2002 for complaints of knee pain, her back going out, and burning in her leg. Surgery for plaintiff's meniscal tear was planned. (Tr. pp. 164, 203). On July 17, 2002, plaintiff still had knee and back complaints and consent for knee surgery was discussed. (Tr. pp. 163, 203). Chest x-rays taken on July 26, 2002 were normal. (Tr. p. 155). When plaintiff returned to Dr. McLachlan on August 7, 2002, she reported having been treated by Dr. Naccari for an infection. Knee and back concerns persisted and plaintiff questioned whether the latter difficulties were aggravated by her fall of April 19, 2001. (Tr. pp. 159-162, 203). By August 9, 2002, plaintiff was cleared for knee surgery but the workers'

compensation carrier of her employer did not believe that her back problems were accident-related. (Tr. p. 153). Plaintiff was seen again by Dr. McLachlan on August 23, 2002 but the treatment note from that date, like most of the doctor's, cannot be characterized as a model of legibility. (Tr. p. 151).

On August 27, 2002, plaintiff underwent arthroscopic surgery of the right knee at the hands of Dr. McLachlan. That procedure revealed a severe arthritic knee involving all compartments but no evidence of a meniscal tear. Surgery consisted of the removal of a loose body, chondrectomy of the patella, chondrectomy of the lateral femoral condyle and intercondylar area, and drilling of the articular surfaces. The post-operative diagnosis was moderately severe chondromalacia with arthritis on the medial side with previously unvisualized ostophytes and degenerative arthritic change in both the medial and lateral compartments. (Tr. pp. 92-94, 203). Following surgery, plaintiff was prescribed crutches and strengthening exercises and the dressing to her wounds was changed on August 28, 2002. (Tr. pp. 144, 203). Her condition was monitored further by Dr. McLachlan on September 4 and 11, 2002 and she was prescribed Cipro, Celebrex, and Vicodin. (Tr. pp. 141-143). Plaintiff's condition was said to be improving on October 9, 2002. She was maintained on Celebrex and was to wean herself off of the crutches. (Tr. p. 139).

Plaintiff was seen for the final time by Dr. McLachlan on October 30, 2002. Her right knee symptoms had improved but she was now developing similar symptoms in the left knee for which an MRI was ordered. (Tr. pp. 137, 203). On November 15, 2002, in response to an inquiry from the worker's compensation carrier of her employer, Dr. McLachlan prepared a narrative letter describing his treatment history of plaintiff. There, the doctor opined that plaintiff had aggravated her arthritic knee and spondylolisthetic condition as a result of her fall on April 19, 2001 and had reached maximum medical improvement with respect to her right knee surgery. It was also likely that plaintiff would require left knee surgery in the future. As for plaintiff's back, if the fall did aggravate that condition it did not cause structural damage and surgery was not indicated. In Dr. McLachlan's opinion, plaintiff was significantly disabled as a result of her knee problems and it was impossible for her to return to her previous work. Her back was expected to continue to cause intermittent problems. However, the doctor believed that plaintiff was capable of performing sedentary work that did not involve getting in and out of a car or long standing or walking. (Tr. pp. 202-210).

At the request of the comp carrier, plaintiff underwent an independent medical examination ("IME") by Dr. Robert Steiner, an orthopedic surgeon, on or about January 21, 2003. Plaintiff

related to the doctor the circumstances of her on-the-job accident and subsequent surgery by Dr. McLachlan. Complaints at the time of the examination included nearly constant low back pain, occasional right buttock pain, and burning and numbness along the right distal thigh and leg. Plaintiff also reported recurrent right knee pain and pain below the right knee with walking; recurrent swelling, popping, and giving way; and, difficulty with climbing stairs.

On physical examination, plaintiff was observed to ambulate with a mild antalgic gait on the right. Range of motion of the right knee was 0 to 125 degrees. Plaintiff complained of tenderness upon palpation along the medial and lateral joint lines but Lachman and McMurray signs were negative and there was no instability. There was tenderness to palpation in the posterior midline of the lumbar spine at L5 but no spasms. Motor, sensory, and deep tendon reflex exams of the lower extremities were normal. Straight leg raising was negative in the sitting position bilaterally but supine straight leg raising caused right knee pain but no radiculopathy. Plaintiff was able to sit with her hips flexed 90 degrees and her knees fully extended without difficulty. X-rays of the right knee revealed no joint line narrowing and no signs of degenerative changes. Radiographic studies of the lumbar spine revealed Grade I spondylolisthesis at L5-S1, pars defects at L5, and spina bifida occulta at L5.

As part of his IME, Dr. Steiner reviewed Dr. McLachlan's narrative report of November 15, 2002 which summarized plaintiff's treatment and right knee surgery. Notwithstanding the x-ray evidence, Dr. Steiner believed that plaintiff had degenerative changes in the right knee which he believed should continue to be treated with anti-inflammatory medication and an exercise program. Conservative care for her pre-existing spondylolisthesis was also appropriate. Unlike Dr. McLachlan, however, Dr. Steiner opined that plaintiff was capable of light-level work with no prolonged walking or standing and no kneeling, squatting, or repetitive stair and ladder climbing. The doctor did feel that plaintiff was capable of riding in a car, getting in and out, and walking short distances. As such, the doctor "... d[id] not object to her returning to work as an insurance salesman." As part of his evaluation, Dr. Steiner also completed a "Physical Capacity Form" indicating that plaintiff could sit six hours per day, walk and/or stand one to two hours per day, occasionally lift up to twenty pounds, and frequently lift up to ten pounds. (Tr. pp. 195-199).

Upon receiving Dr. Steiner's report, the workers' compensation carrier forwarded same to Dr. McLachlan for his review and comment. (Tr. p. 194). On February 12, 2003, plaintiff was seen again by Dr. McLachlan who indicated that he did not believe that she was a good candidate to return to her most recent job. (Tr. p. 135). On

that same date, the doctor met with the comp carrier's licensed vocational rehabilitation counselor and discussed plaintiff's condition. (Tr. p. 190). The counselor subsequently memorialized the results of the conference in a letter which she forwarded to the doctor and asked him to acknowledge its accuracy. (Tr. pp. 181-183). Dr. McLachlan did so on February 24, 2003, confirming his previous opinion that plaintiff was capable of full-time sedentary work which did not involve long periods of standing or walking, climbing, or heavy lifting. (Tr. p. 182).

Plaintiff settled her workers' compensation claim on February 26, 2003, receiving a lump sum of $45,0000 of which $19,200 was apportioned for future medical expenses. (Tr. pp. 223-224). After missing an appointment scheduled for May 7, 2003, plaintiff returned to Dr. McLachlan on June 9, 2003 requesting a release to return to work. (Tr. pp. 134, 179). Following an evaluation, the doctor formally released plaintiff to modified duty with restricted standing and walking. (Tr. p. 180).[1]/ Plaintiff was interviewed by an Administration employee on October 25, 2004 who documented no noticeable limitations. (Tr. pp. 87-89).

---

[1]/ A dispute subsequently arose over who was to bear the cost of this office visit as the doctor was unaware that plaintiff had settled her comp claim but plaintiff had indicated that it was claim-related when she appeared for the evaluation. (Tr. pp. 179, 225, 220-222, 219, 217-218).

On December 8, 2004, plaintiff was consultatively evaluated by Dr. Gary Carroll at the request of the state Disability Determination Service. Plaintiff complained of continued low back pain and bilateral knee pain which interfered with bending, stooping, squatting, kneeling, lifting, walking long distances, and standing long periods of time. However, she reported no motor weakness or muscle atrophy and had no impairment of gait or station. As a result of lack of insurance, plaintiff was not under a doctor's care and was on no prescription medication at the time. Daily activities consisted of light household chores, reading, and watching television. Plaintiff also complained of occasional headaches, relieved by over-the-counter medication, occasional insomnia, occasional easy fatigability, and occasional light headedness.

On physical examination, plaintiff had a reduced range of motion of the thoracolumbar spine but straight leg raising was negative bilaterally. Plaintiff had mild hypertrophic changes in the knees bilaterally but there was a full range of motion without pain or spasm. Neurologically, plaintiff walked in a slow and deliberate manner primarily due to back pain but did not limp and did not require an assistive device. X-rays of the right knee were normal and those of the lumbar spine revealed spondylolysis at L5 with associated Grade II spondylolisthesis at L5/S1 and a

degenerative fifth lumbar disc. Based on the results of his examination and a review of Dr. McLachlan's reports, Dr. Carroll made a diagnosis of: 1) obesity; 2) a history of spondylolisthesis at L5/S1 with mild to moderate functional limitations and mild impairment of gait; 3) degenerative joint disease of the knees post-op arthroscopic surgery on the right knee in August of 2002 with no functional limitations; and, 4) post-op as reported above. (Tr. pp. 226-233).

On December 30, 2004, an Administration medical consultant reviewed plaintiff's file and completed a "Physical Residual Functional Capacity Assessment" form which elicited opinions on plaintiff's capabilities. There, the consultant indicated that plaintiff could occasionally lift and/or carry twenty pounds, ten pounds frequently; could stand and/or walk for two hours per eight-hour workday; could sit for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds, could frequently balance, and could occasionally perform other postural maneuvers; had no manipulative, visual, or communicative limitations; and, was to avoid concentrated exposure to extreme cold or vibrations. Citing the reports of Doctors McLachlan, Steiner, and Carroll, the consultant ultimately concluded that plaintiff could return to her past relevant work as a customer service representative as she described

it. (Tr. pp. 234-241).

The next medical records were not generated until December 30, 2005 when plaintiff was seen at the Southwest Mississippi Regional Medical Center ("SMRMC") Emergency Room for treatment of sinusitis and left otitis media. (Tr. pp. 244-245). Plaintiff returned to the SMRMC Emergency Room on January 9, 2006 with complaints related to the ear, neck, shoulder, throat, and lower back with low back pain increasing over the previous several days. The diagnosis was an acute exacerbation of back pain and left otitis media. Plaintiff was discharged home with Lorcet Plus, Flexeril, and Doxycycline. (Tr. pp. 242-243). Plaintiff was next seen by a nurse practitioner at the SMRMC Outpatient Clinic on February 7, 2006 for complaints of a sore throat, neck and back pain, and shoulder pain, with the pain being described as an incapacitating level of "10" on a scale of 1 to 10. Plaintiff's left shoulder was tender but her gait was normal. The diagnosis was pharyngitits and arthritis of the left shoulder and plaintiff was prescribed Zegerid and Naprosyn. (Tr. pp. 247-248).

The final treatment note, dated February 28, 2006, indicates that plaintiff's throat pain had resolved but that her shoulder pain was no better. The note was positive for left shoulder spasm. The diagnosis was muscle spasm and left shoulder pain and plaintiff was prescribed Darvocet and Zanaflex. (Tr. pp. 246, 248).

Plaintiff's prescription for Naprosyn was also renewed. (Tr. p. 250). As noted earlier, the hearing before the ALJ went forward on May 23, 2006.

Plaintiff challenges the Commissioner's decision to deny Social Security benefits on three grounds. In the first of those, plaintiff alleges that she was unaware that she needed an attorney until she appeared at the administrative hearing and that she was unable to afford one in any event.

Although a Social Security claimant has no constitutional right to counsel, she does have a statutory and regulatory right to have counsel present at a hearing. <u>Hussey v. Astrue</u>, 2009 WL 166666 at *5. (E.D. La. 2009). A claimant may, however, waive her right to counsel if she is given sufficient information to enable her to intelligently decide whether to enlist the services of an attorney or to proceed <u>pro</u> <u>se</u>. <u>Id</u>. "'Sufficient information' includes explanations of the possibility of free counsel, a contingency agreement, and the limitation on attorney's fees to 25% of past due benefits awarded." <u>Watson v. Astrue</u>, 2008 WL 4072831 at *2 (W.D. La. 2008)(quoting <u>Clark v. Schweiker</u>, 652 F.2d 399, 403-04 (5th Cir. 1981)(Unit B)). A mere lack of counsel will not automatically invalidate an ALJ's decision; rather, the claimant must show that she was prejudiced thereby. <u>Brock v. Chater</u>, 84 F.3d 726, 729 n.1 (5th Cir. 1996). With these standards in mind, a review of the

record readily demonstrates that plaintiff was properly advised of her right to counsel and validly waived that right.

Plaintiff filed her applications for Social Security benefits on October 21, 2004. On January 3, 2005, she was informed that her applications had been denied at the initial step of the administrative review process but that she could obtain review of that decision by requesting a hearing before an ALJ. The initial determination notice provided to plaintiff also included the following language:

> [y]ou can have a friend, lawyer, or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help with your appeal.
>
> If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee. We do not withhold money from SSI benefits to pay your lawyer.

(Tr. pp. 33-34).

As suggested, plaintiff formally requested a hearing before an ALJ by completing the Administration's form designed for that purpose. That form also advised plaintiff that:

> [y]ou have a right to be represented at the
> hearing. If you are not represented but would
> like to be, your Social Security office will
> give you a list of legal referral and service
> organizations.

(Tr. p. 35).

Upon receipt of plaintiff's request for hearing, the
Administration sent her an acknowledgment letter which contained
the following:

> **Your Right to Representation**
>
> You may choose to be represented by a lawyer
> or other person. A representative can help
> you get evidence, prepare for the hearing, and
> present your case at the hearing. If you
> decide to have a representative, you should
> find one immediately so that he or she can
> start preparing your case.
>
> Some private lawyers charge a fee only if you
> receive benefits. Some organizations may be
> able to represent you free of charge. Your
> representative may not charge or receive any
> fee unless we approve it.
>
> We have enclosed the leaflet "Social Security
> and Your Right to Representation". We are also
> enclosing a list of groups that can help you
> find a representative.

(Tr. pp. 36-37).

Attached to the acknowledgment letter was a list of some ten
legal assistance providers in southern Louisiana, some of whom "...
may be willing to take your case under a fee agreement whereby no
fee will be charged unless your claim is allowed." (Tr. p. 38). In

due course, plaintiff was notified that her administrative hearing had been scheduled for May 23, 2006 with the notice again reminding plaintiff that she had the option of having someone represent her. (Tr. pp. 24-29). At the outset of that hearing, the following exchange took place:

ALJ:    All right.   You do have a right to representation, and you've been given notice of your right to representation in writing. You had signed a waiver.   Is that correct, Miss Wilson?

HA:     No, she didn't.

ALJ:    Well, that's all right.   I'll explain it to you and we do require you to waive your right to representation in writing, but I want to make sure you understand your right to representation first.   Representatives can be helpful to you in presenting your case.   If you want one, I'll be willing to postpone the hearing to allow you to try to obtain one. They don't require any money up front.   The deal is they take 25 percent of your back pay if you win your case.   If you do not win your case you do not receive a fee.   Having explained that to you, there is a Legal Aid Society that could possibly provide free representation.   Having explained that to you, do you wish to go forward without a representative?

CLMT:    I'll go forth because I called, in the letter they sent me they gave me different people to call.

ALJ:    Uh-huh.

CLMT:   And I called and I never could get anybody, and I don't have any money or –

```
ALJ:        Well, it's not the money, but it would mean a
            delay in your hearing if you want to continue
            to try to get a representative.

CLMT:       No.  I'll just go forth.

ALJ:        All right.  Then if you would sign that, then
            we'll be sure to get that in the file.
CLMT:       Okay.

ALJ:        Okay.  Thank you.

CLMT:       You're welcome.
```

(Tr. pp. 362-363).

As mentioned by the ALJ, the record contains a "<u>Waiver of Right to Representation</u>" form that was signed by plaintiff during the course of the hearing. (Tr. p. 42).

The notices and hearing transcript excerpts set forth above clearly demonstrate that plaintiff was provided "sufficient information" to enable her to validly waive her right to counsel. Plaintiff's first claim is without merit.

In her second challenge to the Commissioner's decision, plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence.  For the reasons that follow, the Court disagrees.

The Regulations provide that, if the fourth step of the sequential analysis set forth in §§404.1520 and 416.920 is reached, the ALJ is required to determine a claimant's RFC which is defined as what the claimant can still do despite her limitations.  20

C.F.R. §§404.1520(e), 404.1545, 416.920(e), and 416.945. Once that assessment is made, the ALJ then compares the demands of the claimant's past work with her present capabilities to determine if prior jobs can be performed. 20 C.F.R. §§404.1520(e) and 416.920(e); <u>Villa</u>, 895 F.2d at 1022; <u>Hollis</u>, 837 F.2d at 1386. The demands of a claimant's past work can be based on descriptions of prior jobs as actually performed or as generally performed in the national economy. <u>Villa</u>, 895 F.2d at 1022 (citing <u>Jones v. Bowen</u>, 829 F.2d 524, 527 (5th Cir. 1987)). The determination of whether a claimant can perform her past work can even be made by the ALJ without vocational testimony. <u>Williams v. Califano</u>, 590 F.2d 1332, 1334 (5th Cir. 1979)(citing <u>Gray v. Secretary of Health, Education and Welfare</u>, 421 F.2d 638, 639 (5th Cir. 1970)); <u>Torres v. Harris</u>, 502 F.Supp. 518, 524 (E.D. Pa. 1980).

Plaintiff sustained an on-the-job injury on April 19, 2001 and began treating with Dr. McLachlan two months later. Between June 11, 2001 and August 23, 2002, plaintiff saw the doctor approximately nine times. On August 27, 2002, Dr. McLachlan performed surgery on plaintiff's right knee. By October 30, 2002, plaintiff had reached maximum medical improvement with respect to the right knee but the left knee was becoming a concern. Although Dr. McLachlan did not believe that plaintiff could return to her past job as an insurance salesperson, he did feel that she was

capable of performing a limited range of sedentary work.

Approximately three months later, plaintiff was evaluated by Dr. Steiner who opined that she could perform light-level work with no prolonged walking or standing and no kneeling, squatting, or repetitive stair or ladder climbing. Contrary to Dr. McLachlan, Dr. Steiner believed that plaintiff could return to her insurance salesperson job. One month later, after meeting with a representative from the workers' compensation carrier, Dr. McLachlan reaffirmed his previous opinion that plaintiff could perform a limited range of sedentary work. On June 9, 2003, Dr. McLachlan formally released plaintiff to a modified duty status with restricted standing and walking. Plaintiff was consultatively evaluated by Dr. Carroll on December 8, 2004 whose limitations were consistent with those that were imposed by Drs. McLachlan and Steiner. Later that month, an Administration medical consultant reviewed the medical records then extant and concluded that plaintiff was capable of performing her past relevant work as a customer service representative.

The foregoing opinions were properly considered by the ALJ prior to making his RFC assessment. On three separate occasions, Dr. McLachlan opined that plaintiff was capable of performing a range of sedentary work. As a treating physician, Johnson, 864 F.2d at 347, and a specialist, Dorsey v. Heckler, 702 F.2d 597, 603

(5th Cir. 1983), Dr. McLachlan's opinions are entitled to considerable weight here. For his part, Dr. Steiner, a specialist in orthopedic surgery, concluded that plaintiff was capable of light-level work. Faced with the various opinions of the treating and examining physicians, the ALJ made an RFC assessment that was consistent with the most conservative of those views. Although plaintiff indicated that her customer service representative job involved only sitting (Tr. p. 78), the VE clarified that such jobs typically allow a sit/stand option. (Tr. pp. 387-388). The ALJ's RFC determination was a proper assessment of the evidence before her.

In her third and final challenge to the Commissioner's decision, plaintiff argues that the testimony of the VE was flawed as the job description which he gave for bench assembler conflicted with that set forth in the Dictionary of Occupational Titles ("DOT").

Case law and the Social Security Regulations themselves counsel that the evidentiary value of a VE's testimony is superior to the information contained within publications like the DOT. "The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." <u>Fields v. Bowen</u>, 805 F.2d 1168, 1170 (5th Cir. 1985). "A vocational expert is able

to compare all the unique requirements of a specified job with the particular ailments a claimant suffers in order to reach a reasoned conclusion whether the claimant can perform the specific job." Id. Recognizing that the DOT is not comprehensive, because it cannot and does not purport to include each and every specific skill and qualification for a particular job, the Fifth Circuit in Fields even went so far as to conclude that the DOT is not "similar evidence" that would satisfy the Commissioner's burden of proof at the fifth step of §404.1520. Fields, 805 F.2d at 1170-71. "DOT job descriptions should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job." Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000). See also Lawler v. Heckler, 761 F.2d 195, 197-98 (5th Cir. 1985); Dellolio v. Heckler, 705 F.2d 123, 126-28 (5th Cir. 1983).

Faced with the live testimony of a well-credential VE like Woodall and the information contained within a publication like the DOT, the ALJ properly gave the former greater weight then the latter. Even assuming that the VE's testimony regarding the bench assembler job was flawed, plaintiff makes no similar challenge to the VE's testimony as it relates to the customer service representative job which thus remains unassailed. Plaintiff

herself indicated that the customer representative job involved only sitting and the VE testified from experience and personal observation that such jobs typically allow an individual to stand up and take a few steps approximately every thirty minutes. The VE's answer to the ALJ'S hypothetical question constitutes substantial evidence that plaintiff was not disabled. See Bowling v. Shalala, 36 F.3d 431, 436 (5th cir. 1994).

Finally, in the concluding portion of her response to the Commissioner's brief, plaintiff includes argument relative to obesity which was presumably prompted by Dr. Steiner's diagnosis. (Rec. doc. 29, p. 5). As plaintiff failed to identify obesity as a disabling condition when she initially applied for Social Security benefits, the Court declines to consider that an independent basis for disability here. Guerin v. Shalala, 29 F.3d 623 (5th Cir. 1994)(citing Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989)). In any event, the ALJ did consider plaintiff's obesity in making her RFC assessment. (Tr. p. 20).

## RECOMMENDATION

For the foregoing reasons, it is recommended that the decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Social Security benefits be affirmed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate

judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en</u> <u>banc</u>).

New Orleans, Louisiana, this <u>17th</u> day of <u>February</u>, 2009.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE